**TONE BROTHERS, INC.,**
Plaintiff–Appellant,

v.

**SYSCO CORPORATION,**
Defendant/Cross–
Appellant.

Nos. 92–1347, 92–1379.

United States Court of Appeals,
Federal Circuit.

July 7, 1994.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Sept. 15, 1994.*

* Archer, Chief Judge, and Nies, Circuit Judge, would rehear the appeal in banc.

Edmund J. Sease, Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, IA, argued for plaintiff-appellant. With him on the brief were Kirk M. Hartung and Heidi E. Sease.

Steve Rosenblatt, Rosenblatt & Associates, P.C., Houston, TX, argued for defendant/cross-appellant. With him on the brief was Paula Morris.

Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Tone Brothers, Inc. ("Tone") appeals from the judgment of the United States District Court for the Southern District of Iowa granting summary judgment for Sysco Corporation ("Sysco") and dismissing the case. *Tone Bros., Inc. v. Sysco Corp.*, 23 USPQ2d 1184, 1992 WL 200128 (S.D.Iowa Mar. 17, 1992). In its complaint, Tone had sought damages and injunctive relief against Sysco for (1) design patent infringement; and (2) trade dress infringement, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Supp. IV 1992), and Iowa state law.

The patent-in-suit is United States Design Patent No. 277,363 for "[t]he ornamental design for a jar or similar article, as shown and described," which issued on January 29, 1985, to Archie G. Drummond, Jr. *et al.* and is assigned to Tone (the " '363 patent"). Tone claims as its trade dress the shape and appearance of its own clear plastic container which it has used for its spices since 1982. Tone has not alleged that it has registered its trade dress as a trademark under either state or federal law.

The district court granted summary judgment for Sysco on the patent claim, holding the '363 patent invalid under the public use

bar of 35 U.S.C. § 102(b) (1988). 23 USPQ2d at 1186–88. The district court also granted summary judgment for Sysco on the Lanham Act claim, holding that Tone's trade dress was neither inherently distinctive nor had acquired secondary meaning so as to support an action under section 43(a). *Id.* at 1188–92. Because the district court's pendent jurisdiction over Tone's state law claims was no longer supported by federal claims, the district court dismissed the state law claims for lack of subject matter jurisdiction. *Id.* at 1193. Tone appeals both the patent and the Lanham Act rulings.

Sysco cross-appeals the district court's denial of its application for attorney fees under 15 U.S.C. § 1117(a) (1988), and under 35 U.S.C. § 285 (1988). *Tone Bros., Inc. v. Sysco Corp.*, No. 4:90–CV–60011, 1992 WL 211078 (S.D.Iowa Apr. 28, 1992). Further, Sysco seeks to recover its attorney fees incurred in this appeal, either under 35 U.S.C. § 285 (1988) or on the ground that Tone's appeal is frivolous.[1]

■ Because we find that there are genuine issues of material fact in dispute, we reverse the grant of summary judgment of patent invalidity, as well as the grant of summary judgment of the non-protectability of Tone's trade dress. The judgment in favor of Sysco dismissing the case is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.[2] In

---

1. Sysco also sought review in its cross-appeal of the following rulings of the district court: (1) its decision that Sysco's summary judgment on the patent claim was not supported by the alternate ground of non-infringement as a matter of law, the court having concluded that there were material facts in dispute on this issue, 23 USPQ2d at 1188; (2) its denial of Sysco's motion for partial summary judgment on the issue of design patent damages, the court having concluded that this issue too presented disputed issues of material fact, *id.* at 1192–93; and (3) its pretrial evidentiary ruling regarding the attorney client privilege, *Tone Bros., Inc. v. Sysco Corp.*, No. 4:90–CV–60011 (S.D.Iowa Mar. 4, 1992). This court previously ordered that Sysco may not appeal these rulings at this time and limited Sysco's cross-appeal to the matter of attorney fees. *Tone Bros., Inc. v. Sysco Corp.*, Nos. 92–1347, –1379 (Fed. Cir. Oct. 15, 1992).

2. Sysco argues, as an alternate ground for upholding the judgment on the patent claim, that the district court erred in denying summary

judgment on its motion for a finding of non-infringement as a matter of law. As noted above, the court concluded that there were issues of material fact in dispute, and thus denied the motion. We refuse to consider the alternate ground. Because infringement of a design patent is a fact-intensive issue, this court is not suited to address the merits of the issue prior to the district court doing so. *See Singleton v. Wulff*, 428 U.S. 106, 120–121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (improper to review the merits of a case where the final order in the case was a dismissal for lack of standing, and where the merits had not been sufficiently developed in the trial court); *see also Confederated Tribes of Colville Reservation v. United States*, 964 F.2d 1102, 1109 (Fed.Cir.1992) (noting that for fact-intensive issues, the trial court has the discretion to deny summary judgment even where summary judgment might otherwise be appropriate).

light of these rulings, we need not address Sysco's cross-appeal on the matter of attorney fees, and we deny Sysco's application for attorney fees in connection with this appeal.

## BACKGROUND

Tone processes and packages bulk herbs and spices. It sells these goods to distributors, who resell them under a wide variety of brand names. Sometime about 1981, Tone conceived the idea, new at that time, of using a container made of clear plastic rather than the traditional tin spice package or an opaque plastic container. In due course, Tone's designers came forward with a large, clear container in the basic shape of a tall box with an oval depression in each side that serves as a hand grip. The container also has a plastic screw-on lid which has a flip-up opening for spooning or shaking out the contents of the container. In September of 1982, Tone's designers filed an application for a design patent on the new container. At about the same time, Tone began selling herbs and spices in the container. As noted above, the application issued as the '363 patent on January 29, 1985.

Sysco is a wholesale distributor of food products, including spices. Prior to March of 1988, Sysco was one of the distributors of Tone's spices, which it resold under the Sysco private label. Sysco, however, began developing its own container in 1985. The Sysco container which resulted from this development project, and which is now alleged to infringe, is generally similar to the Tone container in that both are made of clear plastic, are about the same height, have the same general shape, and have the same kind of flip-up, screw-on lid.

Sysco began using the allegedly infringing container after its private label arrangement with Tone ended in March of 1988. In May of 1989, through its lawyers, Tone informed Sysco that Tone believed the Sysco container infringed Tone's design patent and trade dress. Sysco denied the alleged infringement and refused to cease using the container. On January 10, 1990, Tone filed its district court action, alleging (1) design patent infringement and (2) trade dress infringement under both section 43(a) of the Lanham Act and Iowa state law. As noted above, the district court granted summary judgment for Sysco and dismissed the case, but denied Sysco's application for attorney fees. This appeal and cross-appeal followed.

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We undertake plenary review of a grant of summary judgment. *Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1449, 27 USPQ2d 1297, 1301 (Fed. Cir.1993).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. at 2513. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### II. CLAIM FOR DESIGN PATENT INFRINGEMENT

■ The district court held that the patented design was in public use within the

meaning of section 102(b), title 35, by virtue of the fact that the design was shown to a group of college students more than one year before the filing of the patent application. 23 USPQ2d at 1188.[3] In so holding, the court concluded, as a matter of law, that Tone could not counter Sysco's *prima facie* case of public use with evidence that tended to demonstrate the showing to the students was for an experimental purpose. *Id.* at 1187–88.[4] We hold that this was error.

The following facts pertinent to the alleged public use—as set forth in deposition testimony and uncontested documents—are either undisputed or represent Tone's version. James M. Degen, a consultant, was hired by Tone in 1979, initially to develop a long-range business plan for Tone, and later to do various other projects. One such task, which Degen was assigned on May 14, 1981, was to do the following: "[D]evelop a proposal to test the new one-pound plastic container, versus the existing Tone package versus one-pound tin. This test should cover handling, shaking, spooning positions/satisfaction, etc."

Degen accordingly set up a study of a type he said was referred to in the marketing research business as a "disaster check," in order to get feedback from people who might actually use the container. Degen testified in his deposition that the study was a chance for users to help a manufacturer to improve a product, and to prevent the mistake of introducing a wrong product or one that did not fit the users' needs. He further testified that the purpose of the study was to evaluate the feel, the hold, and the handling of three spice containers: (1) an existing Tone tin container, (2) an existing Tone plastic container, and (3) a prototype of a new plastic container of Tone's. As participants in the study, Degen randomly selected ten students who were dietetics majors at the college where he was teaching, Mundelein College, in Chicago, Illinois.

An interview guide prepared by Degen for the study outlined the study methodology, wherein: (1) the students were to pick up the containers and describe how they felt (e.g., comfortable, awkward, easy to grip, balanced, etc.); (2) the students were asked which container they liked best, and why; and (3) the students were asked how the containers felt when shaking out their contents. Thus, the new container was given to the students to see if it worked properly. Put another way, the students were not shown the new container and asked whether it was pleasing to the eye. Rather, they were asked to test the functional features of the container. Degen testified that there was no confidentiality agreement with the students. Degen documented the students' reactions in a report dated June 5, 1981, that highlighted the reasons why some students preferred the new container, while others preferred the prior container designs. The report also pointed out some potential problems with the new container, as well as suggested improvements. The district court held that, based upon the above evidence, Sysco had made out a *prima facie* case of public use by clear, convincing, and undisputed evidence. 23 USPQ2d at 1188. For its part, Tone argued that the Degen study did not constitute a public use within the meaning of section 102(b) because it was for an

3. Section 102(b), title 35, provides in pertinent part: "A person shall be entitled to a patent unless ... the invention was ... in public use ... in this country, more than one year prior to the date of the application for patent in the United States." Whether or not an invention was in public use within the meaning of section 102(b) is a question of law, which is based upon underlying issues of fact. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed.Cir.1990).

4. The party asserting the public use bar has the initial burden of showing by clear and convincing evidence facts which support the existence of a public use within the meaning of section 102(b). *Manville Sales*, 917 F.2d at 549, 16

USPQ2d at 1591. Once the challenger has made out this *prima facie* case of public use, a burden of production is placed upon the patent owner; the patent owner must come forward with convincing evidence to counter the *prima facie* case. *See U.S. Environmental Prods. Inc. v. Westall*, 911 F.2d 713, 716, 15 USPQ2d 1898, 1901 (Fed.Cir. 1990). At all times, however, because patents are given a presumption of validity under 35 U.S.C. § 282 (1988), the burden of persuasion remains with the party asserting the bar. *TP Labs., Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984).

experimental purpose. The district court rejected this argument, however, based upon what it viewed to be this court's treatment of the public use issue in the context of design patents in *In re Mann*, 861 F.2d 1581, 8 USPQ2d 2030 (Fed.Cir.1988). The district court found relevant the following portion of the *Mann* decision:

> We find no merit in appellant's arguments that the design was not "in public use" because "the table was not used in its natural and intended way" because it was "merely on display," that display at the trade show was not a public use, and that the showing of the table embodying the design was "experimental." The only use possible for an ornamental design is its embodiment, exhibition, and observation.

23 USPQ2d at 1187 (quoting *Mann*, 861 F.2d at 1581, 8 USPQ2d at 2031). The district court also found key the *Mann* court's following discussion of the doctrine of experimental use:

> We see no way in which an ornamental design *for* an article of manufacture can be subject to the "experimental use" exception applicable in the case of functioning machines, manufactures, or processes. Obtaining the reactions of people to a design—whether or not they like it—is not "experimentation" in that sense. In the case of a design, if market testing shows that it has no appeal and the design is *changed,* the result is a new and different design; the original design remains just what it was. Design patents have almost no scope. The claim at bar, as in all design cases, is limited to what is shown in the applicable drawings.

23 USPQ2d at 1187–88 (quoting *Mann*, 861 F.2d at 1582, 8 USPQ2d at 2031 (emphasis in original)). Accordingly, the court rejected, as a matter of law, Tone's attempt to counter Sysco's case of public use with evidence tending to show that the Degen study was for an experimental purpose.

Tone contends that the district court did not properly consider the totality of the circumstances of this case in light of the policies behind the public use bar before it granted summary judgment. When the totality of the circumstances is considered, and the evidence—including evidence of experimentation—is viewed in a light most favorable to it, Tone argues, there are genuine issues of material fact with respect to the public use issue. We agree.

 We have held that, in order to determine whether an invention was in public use within the meaning of section 102(b), a court must consider how the totality of the circumstances of the case comports with the policies underlying the public use bar. *Manville Sales*, 917 F.2d at 549, 16 USPQ2d at 1591. This approach is necessary because the policies behind the bar, in effect, define it. *Id.* at 549–50, 16 USPQ2d at 1591. We have enumerated the policies underlying section 102(b), albeit in the "on sale" context, as follows: (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 860, 226 USPQ 402, 406 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

 Evidence of experimentation is part of the totality of the circumstances considered in a public use inquiry. The fact that there was experimentation occurring is relevant to the question of whether the activities of the inventor were at odds with any of the four policies underlying the public use bar. In other words, the inquiry is not: (1) was there a public use, and, if so, (2) was the public use for a bona fide experimental purpose and thus excused. Rather, there is only one inquiry—was there a public use within the meaning of section 102(b). Illustrating the significance of this distinction is the following discussion of the nature of the doctrine of experimental use in *TP Laboratories, Inc. v. Professional Positioners, Inc.*:

> [T]he court should have looked at all of the evidence put forth by both parties and

should have decided whether the entirety of the evidence led to the conclusion that there had been "public use." This does not mean, of course, that the challenger has the burden of proving that the use is not experimental. Nor does it mean that the patent owner is relieved of explanation. It means that if a *prima facie* case is made of public use, the patent owner must be able to point to or must come forward with convincing evidence to counter that showing.

724 F.2d 965, 971, 220 USPQ 577, 582 (Fed. Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984).

■ In the present case, the display of the design to the students appears to have been for the purpose of evaluating the effect of the functional features of the design on the typical functioning of a spice container.[5] A display of an ornamental design can be directed toward generating consumer interest in the aesthetics of the design, as appears to have been the case in *Mann,* or it can be directed toward determining whether the design's functional aspects have any adverse effect on users of the structure embodying the design, as appears to have been the case with the Degen study. Such a distinction has a direct bearing on the policies underlying the public use bar. For example, the display of the design in *Mann,* unlike the display in the present case, appears to have been for a purpose directly contrary to the public use

bar policy of preventing an extension of the patent term through pre-application commercial exploitation. Given the fact that the wrought iron table design in *Mann* was exhibited at a trade show, an exploitative purpose seems to have been present. Because of the commercial nature of a trade show, it must be assumed that the table was ready to be sold to consumers and that the manufacturer had already made sure that the ornamental design of the table did not detract from the practical functioning of the table. In the present case, however, there appears to have been a lack of exploitative purpose. The design was shown to students, not at a trade show, and Degen testified that the students did not know the identities of the companies associated with the various designs they were shown. In addition, it appears that the showing was for the purpose of testing the functional features of the design. As indicated on the interview guide for the Degen study, the students were asked how the containers felt when shaking out their contents. Further, Degen characterized the study as a "disaster check," which indicated that the design was not set in stone at the time of the study.[6] Thus, as a factual matter, *Mann* involved issues that differ from those that must be addressed in this case.[7]

■ None of our cases have addressed the issue of whether experimentation

---

5. Patentable designs may embody functional features. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1563, 7 USPQ2d 1548, 1553 (Fed.Cir.1988) ("[I]f a patented design is 'primarily functional,' rather than primarily ornamental, the patent is invalid."); *In re Garbo,* 287 F.2d 192, 193, 129 USPQ 72, 73 (CCPA 1961) ("[A] design may embody functional features and still be patentable...."); *cf. In re Aslanian,* 590 F.2d 911, 914, 200 USPQ 500, 503 (CCPA 1979) ("[T]he specific disclosure of structure in a design patent application may inherently teach functional features."). Such appears to be the case here. Thus, contrary to Sysco's suggestion, we do not think applicable to this case the settled law on utility patents that experimentation performed with respect to non-claimed features of the device cannot negate the effect of activities that would otherwise bar patentability under section 102(b). *See In re Brigance,* 792 F.2d 1103, 1109, 229 USPQ 988, 991–92 (Fed.Cir.1986).

6. Indeed, one of the inventors of the '363 design testified in deposition that there were changes to the design after the Degen study. And although there is no evidence in the record that indicates that the changes resulted from the Degen study, that has no bearing on the existence of changes after the study indicating that the design was not set in stone at the time of the study.

7. The broad statement in *Mann* regarding the doctrine of experimental use—upon which the district court relied in this case—is arguably dictum. It is difficult to see how, under any standard, one could argue that displaying an item at a trade show constitutes experimental use. By its very nature, a trade show is a vehicle for promoting sales of a product. Consequently, the element of commercial exploitation is present. The court in *Mann* did not address the issue of whether the doctrine of experimental use may apply with respect to testing directed toward functional aspects of a design. That is the issue ripe for decision in this case.

involving the functional aspects of a product to which a design patent relates can be a non-public use. We do so today and hold that experimentation directed to functional features of a product also containing an ornamental design may negate what otherwise would be considered a public use within the meaning of section 102(b). Accordingly, a finding of public use may still be negated in this case if it is found that the Degen study was for a bona fide experimental purpose, such that none of the policies behind the public use bar were implicated by the study. In that regard, we note that this court has listed factors which should be considered in connection with the experimental use inquiry: (1) the length of the test period and number of tests as compared with a similar type of test on a similar type of design; (2) whether a user made any payment for the device; (3) whether a user agreed to use secretly;[8] (4) whether records were kept of the progress of the test; and (5) whether persons other than the designer conducted the asserted experiments. *TP Labs.*, 724 F.2d at 971–72, 220 USPQ at 582.

▪▪▪ In sum, the district court erred by rejecting, as a matter of law, Tone's argument that the Degen study was for a bona fide experimental purpose, thereby overcoming the asserted *prima facie* case of public use. As a matter of law, experimentation directed to functional features of a product to which an ornamental design relates may negate what otherwise would be a public use within the meaning of section 102(b). Viewing the evidence in a light most favorable to Tone, there is considerable evidence on the basis of which it could be concluded that the Degen study did not amount to a public use.

Accordingly, we reverse the district court's grant of summary judgment on the ground of invalidity of the '363 design patent under the public use bar.

## III. CLAIM UNDER SECTION 43(a) OF THE LANHAM ACT

▪▪▪ Section 43(a) of the Lanham Act creates a federal cause of action for trade dress infringement. The current version of section 43(a) reads in pertinent part:

**15 U.S.C. § 1125. False designations of origin and false descriptions forbidden**

**(a) Civil action**

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

. . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (Supp. IV 1992). In reviewing Lanham Act claims, we look to the law of the regional circuit where the district court sits, here the Eighth Circuit. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998

---

8. The students at Mundelein College who participated in the Degen study were not told to keep what they saw and heard during the study a secret. *See* 23 USPQ2d at 1186. From this evidence, the district court concluded that the circumstances of the Degen study fit within the definition of public use set forth in *In re Smith*, 714 F.2d 1127, 218 USPQ 976 (Fed.Cir.1983), namely, that a public use under section 102(b) is "any use of that invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." 23 USPQ2d at 1186, 1188 (quoting and citing *Smith*, 714 F.2d at 1134, 218 USPQ at 983). The circumstances of the Degen study distinguish it

from the survey in *Smith*. In *Smith*, the lack of control and the extensiveness of the consumer test created a situation where actual samples of the invention were in the public domain, a situation where public belief of the invention's free availability was much more likely than in the present case. Moreover, we have held that the existence of a confidentiality agreement is not dispositive of the public use issue. *See, e.g., Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987); *TP Labs.*, 724 F.2d at 972, 220 USPQ at 583.

F.2d 985, 987–88, 27 USPQ2d 1516, 1518 (Fed.Cir.1993).

Tone contends that it has trade dress rights in the shape and appearance of its spice container.[9] The district court held on summary judgment that Tone's alleged trade dress was not protectable under the Lanham Act because Tone had failed to establish that its container design had acquired secondary meaning. 23 USPQ2d at 1188–92. The court further held that its summary disposition was supported by the alternate ground that Tone had not shown its container design to be inherently distinctive. Id. at 1192.

Tone argues that the district court erred in granting summary judgment because questions of material fact exist as to the status of its container design as trade dress protectable under the Lanham Act. In particular, Tone argues that the court overlooked evidence that its container design had acquired secondary meaning as its manufacturer's mark despite extensive private labeling by others. Tone also argues that the court did not properly consider the issue of whether Tone's container is inherently distinctive. We agree with Tone in both respects and therefore reverse the district court's grant of summary judgment on the Lanham Act claim.[10]

 As the Supreme Court held in Two Pesos, Inc. v. Taco Cabana, Inc., — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), trade dress that is inherently distinctive as an identification for particular services is protectable under section 43(a) of the Lanham Act even without a showing that the trade dress has acquired secondary meaning. Id. — U.S. at —, 112 S.Ct. at 2761. Therefore, we must reverse the district court's grant of summary judgment if we find that there are genuine issues of material fact as to either the issue of acquired distinctive-

ness (i.e., secondary meaning) or the issue of inherent distinctiveness of the shape and appearance of Tone's container.

### A. Acquired Distinctiveness—Secondary Meaning

 Tone, as the party attempting to establish legal protection for its unregistered trade dress, has the burden of proving secondary meaning by a preponderance of the evidence. See Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1578–79, 6 USPQ2d 1001, 1006 (Fed.Cir.1988). Secondary meaning is a term of art which denotes that there is "an association formed in the minds of the consumers between the mark and the source or origin of the product." Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330, 228 USPQ 429, 432 (8th Cir.1985) (citing Truck Equip., 536 F.2d at 1219–20, 191 USPQ at 86–88). Such an association is proved by a variety of direct and circumstantial evidence. See generally 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15.10[3] (3d ed. 1992 and Release #1 1993). Secondary meaning must be shown to have existed prior to the date on which the accused infringer commenced using a confusingly similar trade dress. Co–Rect Prods., 780 F.2d at 1330, 228 USPQ at 432.

The following facts relevant to the issue of secondary meaning—as set forth in deposition testimony and uncontested documents— are either undisputed or represent Tone's version. Tone's container having the asserted trade dress was first sold in September of 1982; Sysco's allegedly infringing container was introduced in March of 1988. Thus, in order to prevail on the issue of secondary meaning, Tone must prove that such meaning

---

**9.** The protectability of such subject matter as trade dress Sysco does not dispute. We note that Eighth Circuit precedent, as well as this circuit's, supports the proposition that containers are protectable as trade dress. See Truck Equip. Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1214–15, 191 USPQ 79, 82–83 (8th Cir.) (exterior design of a twin-hopper bottomed grain semi-trailer protectable as trade dress), cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); In re Mogen David Wine Corp., 328 F.2d 925, 932, 140 USPQ 575, 580–81 (CCPA 1964) (the same for a wine decanter).

**10.** Sysco invites us to address an alternate ground for judgment in its favor on the Lanham Act claim—non-infringement as a matter of law. We decline to address the issue as it was not addressed by the district court. See Singleton v. Wulff, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

was acquired during the period between September of 1982 and March of 1988.

Tone's container has been sold in what is known as the institutional food service channel (e.g., restaurants, schools, and prisons); it has also been sold in membership wholesale clubs. Sysco sells only in the institutional food service channel. Thus, the relevant consumers for secondary meaning purposes are buyers in the institutional food service channel, such as chefs and other high-volume institutional buyers.

It is undisputed that Tone has placed Tone spices in the Tone containers and has sold them to others (including Sysco) for private label resale. During the time period relevant to the secondary meaning inquiry (1982 to 1988), about ninety percent of sales of Tone spices in the institutional food service channel were made under approximately a hundred different private labels. The remaining ten percent of the sales in this channel were made under the Tone label.

Initially, the Tone containers containing spices sold under private labels did not bear any source indicia other than the distributor identified on the label. It is not clear from the record, however, whether the distributors were identified as distributors, and not as the manufacturing source of the spices. After about one or two years, Tone required that the private labelers display Tone's "Heart–Loc" and "Spice Advice" trademarks on the private label. Further, at about the same time, Tone required that the words "Tone Brothers" appear on the portion of the private label that was on the back side of the container, and an imprint of the Tone leaf symbol was displayed on the bottom of the container. Finally, after January 1985, when the design patent issued, the Tone container displayed the patent number on the bottom.

Tone representatives attended food shows during the relevant time period and incurred travel expenses to do so. Tone representatives also travelled to meet with distributors. In 1987, print advertisements featured the Tone container. The evidence of sales expenses in connection with the Tone container consists of lump sums for each year.

Tone's total sales receipts in the food service channel increased steadily from 1983 to 1987. Receipts for 1988 and 1989 show a decline. Tone's total sales receipts involving the Tone container in all channels show a steady increase through 1987, with receipts increasing less in 1988 and 1989.

The Tone container, which was introduced to the market in September of 1982, was the first in the food service channel to be made of clear plastic, rather than the traditional tin or opaque plastic. Competitors have since developed similar containers. Sysco began developing its clear plastic spice container in 1985. The Sysco designers had before them the Tone container and the containers used by Tone's competitors.

Upon this evidence, the district court held, as a matter of law, that Tone had failed to establish that its container had acquired a secondary meaning. 23 USPQ2d at 1193. The court stated that Tone had offered no direct evidence in the summary judgment record of consumer association between the Tone container and a single source, such as affidavits or depositions of consumers, surveys or statistical evidence, or admissible evidence of unsolicited consumer responses or testimonials. *Id.* at 1189. Further, the court was persuaded by the evidence and case law regarding private labeling to conclude that Tone had created a situation where the consumer could not possibly have associated Tone as the sole source of the spices by reason of the container's shape and appearance. *Id.* at 1191. Finally, the court dismissed Tone's proffered circumstantial evidence—advertising, volume of sales in Tone's container, and intentional copying—because "the volume and extent of the private labeling arrangements vitiate the inferences which ordinarily arise from indirect evidence usually relied upon to support consumer association." *Id.* at 1192.

▮ Tone argues that the district court erred in summarily holding that Tone had failed to prove secondary meaning because there are genuine issues of material fact for trial. In that regard, Tone points to a consumer survey, relied upon by Tone, but not mentioned in the district court's opinion, wherein thirty-seven percent of the survey

respondents associated an unlabeled Tone container with a single, albeit anonymous, source. Tone also argues that the court improperly created a *per se* rule that where there is private labeling, secondary meaning cannot be shown. We agree with Tone that genuine issues of material fact made summary judgment inappropriate. Further, although we disagree with Tone's characterization of the district court's treatment of the private labeling issue as a *per se* rule, we agree that the district court gave too much weight to the evidence of private labeling in this case.

The direct evidence on which Tone relies, and which was not addressed by the district court, is a marketing study conducted by the Gelb Consulting Group, Inc.—the Gelb study. Although the Gelb study was prepared for Sysco and purports to reach the ultimate conclusion that Tone's container lacked secondary meaning, Tone contends that the survey directly supports the opposite conclusion—that secondary meaning existed. Tone notified the district court that its expert would testify as to how the survey supported the existence of secondary meaning.

The Gelb study states that its objective was "[t]o determine whether U.S. food service executives perceive a secondary meaning to one-pound plastic spice containers, particularly the Tone Brothers container." The Gelb study documented a survey that was conducted in a manner similar to that approved in *In re Jockey International, Inc.,* 192 USPQ 579, 581 (TTAB 1976). In *Jockey,* the Trademark Trial and Appeal Board suggested that the appropriate approach in a trade dress survey on secondary meaning is to first ask whether the respondent associates the trade dress with a specific brand or company, and, if so, to then ask the respondent to name the company or brand. *Id.; see also Textron, Inc. v. United States Int'l Trade Comm'n,* 753 F.2d 1019, 1023, 224 USPQ 625, 627–28 (Fed.Cir.1985).

In the Gelb study, the respondents (chefs and institutional spice purchasers) were shown the Tone container without labeling. After a series of introductory questions, the respondents were asked a first question:

Let's suppose you were shipped spices in this container without a label. Would you know by its shape if the spices came from a single manufacturer, or would spices in a container with this shape come from different manufacturers?

Those who answered that they thought the spices came from a single manufacturer were then asked a second question:

Which one manufacturer would spices in this container have come from?

In response to the first question, thirty-seven percent of the respondents answered that they identified the unlabeled Tone container with a single manufacturer. However, in response to the second question, the respondents identified a total of twenty different sources as the single source. The single source most named was McCormick, by nine percent of the total sample. Tone, as the single source, was named by only two percent. The remainder were Sysco, three percent; Kraft and Schreiber, two percent each; all others (fifteen different sources), twelve percent; and do not know, seven percent.

■ Tone, relying on the anonymous source rule, contends that the answers to the first question evidence a consumer association between Tone's container and a single, albeit anonymous, source, which is all that is necessary to establish secondary meaning.[11] We agree.

■ The anonymous source rule is directed to the situation where a typical buyer would not know the corporate identity of the source. *See In re Polar Music Int'l AB,* 714 F.2d 1567, 1571–72, 221 USPQ 315, 317–18 (Fed.Cir.1983); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 155, 136 USPQ 508, 513–14 (9th Cir.), *cert. denied,* 374 U.S. 830 (1963); *Kampgrounds*

11. The anonymous source rule states that a consumer need not know the identity of the single source, and that all that is necessary to establish secondary meaning is that the consumer associate the trade dress with a single, albeit anonymous, source. *See* 15 U.S.C. § 1127 (1988); *In*

*re Polar Music Int'l AB,* 714 F.2d 1567, 1571–72, 221 USPQ 315, 317–18 (Fed.Cir.1983). In other words, all that is necessary is that the consumer believe that the trade dress denotes a "single thing coming from a single source." *Co–Rect Prods.,* 780 F.2d at 1330, 228 USPQ at 432.

of America, Inc. v. North Delaware A–OK Campground, Inc., 415 F.Supp. 1288, 1293, 190 USPQ 437, 441 (D.Del.1976), aff'd without op., 556 F.2d 566 (3d Cir.1977). The Fleischmann Distilling case is illustrative of the principles behind the anonymous source rule. In that case, the Ninth Circuit stated of the "Black & White" trademark for Scotch whiskey:

Of course there may not be one in a hundred buyers of this whiskey who knows that it is made by Buchanan or wholesaled by Fleischmann. Probably all that such buyers know is that Black & White Scotch whiskey has satisfied them in the past or that they have heard of it and the average purchaser would no doubt select for the use of his guests something with which he was familiar and thus purchase Black & White Whiskey.

314 F.2d at 155, 136 USPQ at 513. We think it possible that the same could be said of Tone's alleged trade dress, and Tone has argued as such. The theory is that even though chefs and other relevant buyers do not know that it is Tone who manufactures the spices sold in the container having a familiar shape and appearance, they have purchased spices in such containers in the past and will rely on the shape and appearance of the container to purchase spices in the future. In this light, we hold that, in relying on the Gelb study, in addition to other circumstantial evidence on the issue of secondary meaning (e.g., advertising, the amount of spices sold in Tone's container, and intentional copying), Tone has raised a genuine issue of material fact—whether there is an association in the mind of the consumer between the container's shape and appearance and an indication of source for the spices contained therein, as a separate indication from that of the private labels. See Co–Rect Prods., 780 F.2d at 1333 n. 9, 228 USPQ at 434 n. 9 ("Consumer surveys are recognized by several circuits as the most direct and persuasive evidence of secondary meaning.").

Sysco maintains that the responses to the survey's second question undermine any possible inference that buyers associated Tone's container with a single source. In this re-

gard, Sysco argues that the Gelb study shows that the only "source" with which there was an association was several different sources, not a single anonymous source. Tone attempts to explain this apparent conflict between the two responses. First, Tone explains that Sysco, in an authorized manner, had used the Tone container for several years, before changing to the accused container of this action. This explanation seems to weigh against Tone's position, however, as it suggests that the private labels incorrectly indicated to the public that the distributor identified on the label was the manufacturing source. Next, Tone explains that there are survey reliability problems with asking respondents to answer questions off the top of their heads.

We take no position as to inferences which can be drawn from the data contained in the Gelb study. We only note that several inferences seem plausible, some of which support Tone's position on the secondary meaning issue. These factual issues need to be addressed on remand after hearing from Tone's proffered expert.

■■■ Further, contrary to what was found by the district court, we do not think that Tone's extensive private labeling arrangements necessarily make it impossible for Tone to establish an association in the mind of the relevant consumer between the container's shape and appearance and a single manufacturing source. We emphasize that the focus of the secondary meaning inquiry in this case is whether the relevant consumer attached significance to the shape and appearance of the container as an indicator of the manufacturing source. The private labeling evidence is nevertheless relevant to the secondary meaning inquiry in that Tone may have mistakenly caused the relevant consumer to place reliance on the private label as an indicator of the manufacturer of the spices. In this regard, we note that it is unclear from the record whether the distributors were identified as distributors on the private label. Further, evidence in the record seems to support the notion of misplaced reliance, as Tone's president acknowledged that private label names make an impression on the relevant consumers.

■ On the other hand, the evidence of record does not necessarily lead to the conclusion that the shape and appearance of the container did not come to serve as an indicator of the manufacturer of the spices despite the private labeling. Tone's president testified that he believed that the significance of the private labeling on the consumer was separate from the impressions created by the shape and appearance of the container. Tone's president also testified that a certain private labeler had told him that consumers know that the company identified on the private label is not the manufacturer of the spices. This testimony, although hearsay, tends to support the conclusion that the relevant consumer would not think that the company identified on the private label was the manufacturer of the spices, and instead may attach significance as to the manufacturing source to the container itself. In sum, and particularly in relation to the existence of private labeling, we hold that a genuine issue of material fact exists—whether the relevant consumers associated the shape and appearance of the container with a single albeit anonymous manufacturing source despite the extensive private labeling.

■ Finally, Tone's failure to offer an affidavit from a relevant consumer addressing whether Tone's container indicated a manufacturing source does not fatally undermine Tone's position. To begin with, testimony of random buyers is often subject to suggestion and bias, especially if associated with one of the parties. *See Premier–Pabst Corp. v. Elm City Brewing Co.*, 9 F.Supp. 754, 760 (D.Conn.1935). Further, Tone indicated to the district court its intended reliance on the Gelb study, advertising, the amount of spices sold in Tone's container, and intentional copying, in order to prove the significance which consumers attach to the size and appearance of the container. In this regard, we note that a finding of secondary meaning can be sustained on purely circumstantial evidence. *See Yamaha Int'l*, 840 F.2d at 1583, 6 USPQ2d at 1010 (sustaining a finding of secondary meaning in a guitar head design based essentially on use of the design in advertising and promotion in conjunction with other circumstantial factors). Therefore, we conclude that the evidence proffered thus far by Tone is sufficient to raise a genuine issue of material fact on the issue of secondary meaning.

Accordingly, we reverse the district court's holding that there is no genuine issue of material fact in connection with the issue of secondary meaning.

### B. Inherent Distinctiveness

In *Two Pesos*, the Supreme Court explained that in determining inherent distinctiveness of trade dress, categories of generally increasing distinctiveness can be employed; that is, the trade dress can be categorized as either (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. 112 S.Ct. at 2757, 23 USPQ2d at 1083. The latter three categories are deemed inherently distinctive. *Id.* In addition, one of our predecessor courts, the Court of Customs and Patent Appeals, set forth several factors to consider in determining whether or not a design is inherently distinctive, including whether the design is a "common" basic shape, whether it is unique or unusual in a particular field, whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods, and whether it is capable of creating a commercial impression distinct from the accompanying words. *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344, 196 USPQ 289, 291 (CCPA 1977).

Although the district court concluded that inherent distinctiveness in the absence of proof of secondary meaning is not sufficient for protectable trade dress,[12] it nevertheless

---

12. The district court, whose decision was entered on March 17, 1992, did not have the benefit of the June 26, 1992 *Two Pesos* decision before it. The Eighth Circuit, prior to *Two Pesos*, appears to have followed the traditional common law rule that secondary meaning was required for trade dress to be protectable. *See Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247, 15 USPQ2d 1053, 1055 (8th Cir.1990). Nevertheless, the law as enunciated in *Two Pesos* that inherently distinctive trade dress is protectable even if secondary meaning is not established must be followed in this case. *Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 825–26, 24 USPQ2d 1121, 1130 (Fed.Cir.1992); *see also Salaam v. Lockhart*, 856 F.2d 1120, 1123

addressed the inherent distinctiveness issue. The district court held: "The evidence is insufficient to establish that the Tone container is inherently distinctive. There is nothing about the bottle itself which connects it either with spices generally or with Tone, in particular." 23 USPQ2d at 1192.

We agree with Tone that the district court's analysis on this question confuses the issues of inherent distinctiveness and secondary meaning. To be inherently distinctive trade dress need not, as the district court implies, have an inherent association with the product, or with the owner of the alleged trade dress. Indeed, were it the case that the Tone container is of such a design that it is connected with spices generally, that fact would actually weigh against a finding of inherent distinctiveness, as opposed to descriptiveness. *See Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 609, 228 USPQ 519, 521 (7th Cir.1986) ("To allow a firm to use as a trademark a generic word, or a descriptive word still understood by the consuming public to describe, would make it difficult for competitors to market their own brands of the same product."). Thus, the focus of the inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 582–84, 27 USPQ2d 1189, 1192–93 (2d Cir.1993).

In addition, there are genuine issues of material fact in dispute in connection with this issue. Viewing the evidence in a light most favorable to Tone, there is evidence on the basis of which a reasonable finder of fact could find inherent distinctiveness. We note that there appears to be no dispute that the Tone container was the first of its kind in the food service channel. *See* 23 USPQ2d at 1189. Supporting this fact is the testimony of a third party spice distributor who stated that he had never seen a transparent spice container in the food service channel before he saw Tone's container, nor had he seen the particular shape of Tone's container before. James Degen, who conducted the study of Tone's container, also testified that Tone was the first to use a transparent container. Finally, it appears that one of Tone's competitors—McCormick—recognized that Tone was the first to come out with a transparent container. Such evidence, we think, raises issues of material fact regarding the inherent distinctiveness of Tone's container design.

Sysco argues that Tone's use of private labeling destroys all trade dress rights, regardless of whether those rights arose because of inherent distinctiveness or secondary meaning. Tone maintains that its private labeling is only relevant to the secondary meaning inquiry—discussed above. The cases cited by Sysco do not support the proposition it advances. *Seabrook Foods,* 568 F.2d at 1345, 196 USPQ at 291, and *Ambrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1537 (11th Cir.1986), discuss third party uses of prior, similar trademarks; they do not address private labeling. We do agree with Sysco that the inherent distinctiveness of a trade dress depends on what other types of trade dress were being used in the particular field prior to the introduction of the trade dress at issue. However, this does not mean that the distinctiveness of Tone's container must be measured against itself, simply because private labels have been affixed to the container since its introduction on the market.[13] Rather, the issue of whether private labeling renders inherently distinctive trade

---

(8th Cir.1988) (remand of 42 U.S.C. § 1983 claim warranted when intervening decision by the Supreme Court alters applicable First Amendment law).

**13.** The other cases upon which Sysco relies do not relate the existence of private labeling to the issue of inherent distinctiveness. Rather, they are cases where private labeling was addressed only in relation to the issue of secondary meaning. *See J.R. Clark Co. v. Murray Metal Prods. Co.,* 219 F.2d 313, 320, 104 USPQ 224, 229–30 (5th Cir.1955); *Quaker State Oil Refining Corp. v. Quaker Oil Corp.,* 453 F.2d 1296, 1299, 172 USPQ 361, 363–64 (CCPA 1972); *In re Hillerich & Bradsby Co.,* 204 F.2d 287, 291, 97 USPQ 451, 454 (CCPA 1953); *Zin–Plas Corp. v. Plumbing Quality Agf. Co.,* 622 F.Supp. 415, 418, 227 USPQ 310, 312 (W.D.Mich.1985); *R.M. Smith, Inc. v. Collins Ltd.,* 219 USPQ 465, 470 (W.D.Pa. 1983), *aff'd without op.,* 729 F.2d 1449 (3d Cir. 1984).

dress non-protectable is more properly analyzed by determining whether the private labeling renders an inherently distinctive trade dress incapable of serving as an indicator of origin. *See Defiance Button Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1061–62, 225 USPQ 797, 802–03 (2d Cir.), *cert. denied,* 474 U.S. 844 (1985). The parties have not briefed this issue, and we think that genuine issues of material fact exist as to whether Tone's trade dress, assuming it is proved to be inherently distinctive, is still capable of serving the trademark function of indicating origin despite the private labeling.

## CONCLUSION

As far as the claim of design patent infringement is concerned, we reverse the grant of summary judgment on the issue of design patent validity. As far as the Lanham Act claim is concerned, we reverse the grant of summary judgment on the issues of secondary meaning and inherent distinctiveness. We thus vacate the judgment in favor of Sysco and remand for further proceedings consistent with this opinion.[14]

## COSTS

Each side shall bear its own costs.

*VACATED AND REMANDED WITH INSTRUCTIONS*

---

14. In light of our decision on the merits of this appeal, we need not address Sysco's appeal of the district court's denial of Sysco's claim for attorney fees under 15 U.S.C. § 1117 and 35 U.S.C. § 285, and we deny Sysco's claim for its attorney fees in connection with this appeal.