THIS OPINION IS A
PRECEDENT OF
THE TTAB

Hearing:                                              Mailed:
January 13, 2009                                      June 12, 2009

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

Nextel Communications, Inc.

v.

Motorola, Inc.

———

Opposition No. 91164353
to application Serial No. 78235365

———

John I. Stewart, Jr. of Crowell & Moring, LLP for Nextel
Communications, Inc.

Thomas M. Williams, Esq. of Howrey LLP for
Motorola, Inc.

———

Before Holtzman, Zervas, and Wellington, Administrative
Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

On April 8, 2003, Motorola, Inc. (hereinafter,

"applicant" or "Motorola") filed an application to register

on the Principal Register a sound described as follows:

> The mark consists of an electronic chirp consisting of
> a tone at 1800 Hz played at a cadence of 24
> milliseconds ON, 24 ms OFF, 24 ms ON, 24 ms OFF, 48 ms
> ON.

Applicant seeks to register this sound (hereinafter, "chirp") as a mark for "cellular telephones and two-way radios" in Class 9. The application (Serial No. 78235365) contains an allegation of first use anywhere and first use in commerce on April 30, 1996.

Nextel Communications, Inc. (hereinafter, "opposer" or "Nextel") has opposed registration, under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052 and 1127, on the following grounds, as amended:[1] (1) that applicant has not used the chirp as a trademark in commerce; and (2) that the chirp is not inherently distinctive and has not acquired distinctiveness.

Applicant, in its amended answer, denied the salient allegations of the notice of opposition.[2] Applicant also asserted, as an affirmative defense, that its proposed mark has acquired distinctiveness.

### The Record

The record automatically includes the pleadings and the file of the involved application. Rule 2.122(b).

---

[1] Opposer also asserted in its notice of opposition allegations regarding likelihood of confusion and functionality as grounds for opposition, under Sections 2(d) and 2(e)(5), respectively. However, these grounds were not pursued at trial or otherwise argued by opposer in its brief. We therefore deem these grounds to be waived. Finally, as discussed *infra*, the Board holds the notice of opposition to be amended under FRCP 15(b) to assert issue preclusion as a ground.

[2] Applicant admits certain background allegations regarding opposer's services and the relationship between opposer and applicant, discussed *infra*, but ultimately denies the allegations involving the grounds for opposition.

Opposer submitted the trial testimony, with accompanying exhibits, of the following individuals: Mary Matthews, opposer's former vice president of marketing, communications and media; Mark A. Schweitzer, former chief marketing officer for Sprint Nextel; and Dr. Jacob Jacoby, a survey expert. In addition, opposer filed a notice of reliance which makes of record applicant's responses to certain discovery requests, as well as designated portions of the Rule 30(b)(6) deposition testimony from applicant's designated representative, William Werner; the file history of opposer's application Serial No. 78575442; and various printed publications.[3]

Applicant has submitted the deposition testimony, with accompanying exhibits, of the following individuals: Peter Aloumanis, applicant's vice president for Sprint and iDEN International Products; Eric D. Brooks, applicant's vice president of engineering; Otto Geiger, applicant's manager for global business operations; and Matthew Gordon, an employee of applicant's marketing group. In addition, applicant filed a notice of reliance upon the following: opposer's responses to certain interrogatories; several

---

[3] Both parties designated portions of the record, including documents and testimony, as "confidential." We have, of course, considered all evidence of record, but are mindful of the portions designated as "confidential" and thus refer to such matters in only general terms where practical. Therefore, any omission of specific reference to these materials, or any other

third-party registrations for sound marks; and portions of applicant's discovery deposition of opposer's Rule 30(b)(6) designated witness, Mary Matthews.[4]

In rebuttal, opposer filed a notice of reliance on additional portions of the discovery deposition of Mary Matthews, pursuant to Rule 2.123, to "complete and clarify testimony relied on by applicant." In addition, opposer submitted the rebuttal testimony of Thomas Natoli, former vice president of service and repair for Sprint Nextel, and Mary Matthews.

Both parties filed briefs, and opposer filed a reply brief. In addition, counsel for both parties presented arguments at an oral hearing held before the Board on January 13, 2009.

### Evidentiary Objections

Applicant has raised two objections to certain evidence introduced (and relied upon) by opposer. Specifically, applicant requests that the Board disregard the testimony of opposer's witness Mary Matthews relating to a 1999 study called "Icon." According to Ms. Matthews' testimony, the study was the result of opposer's internal efforts to identify what "graphic elements, tag lines, phrases,

---

evidence, should not be construed as indicating that such has not been considered.
[4] Each party filed, via notice of reliance, counter-designations to the other's designations of discovery depositions.

including the chirp...provided the closest association in the consumer's mind to the Nextel brand." Matthews testimony, 11:21-25. Applicant states that the actual study or report was never produced during discovery; nor was it introduced as an exhibit at trial, and thus applicant was unable to properly cross-examine Ms. Matthews regarding her reliance thereon. Second, applicant objects to the introduction of a document (a printout involving cadence times), identified as Exhibit 7 to the deposition transcript of applicant's witness, Eric D. Brooks, and further requests that all testimony regarding this document be disregarded. Applicant essentially argues that this document was never properly authenticated by Mr. Brooks who indeed testified that he had never seen the document. Brief, Exhibit D at unnumbered p. 2, referencing Brooks testimony at pp. 69-70 and Exhibit 7 thereto.

In response to the first objection, opposer contends that it "cites the testimony of Ms. Matthews not to prove the content of the 1999 Icon Study, but rather to show the conclusions she drew and the actions she took were based upon her understanding of the study." Brief, p. 23 (footnote 15). Nevertheless, the fact remains that this "Icon" study was never produced either in discovery or as a testimonial exhibit. Without the study, we agree with applicant that it is not possible to challenge the study,

5

e.g., its methodology and conclusions.  Accordingly, applicant's objection is well-taken, and all testimony regarding this study, including any characterizations of the study's findings and/or reliance thereon, has been disregarded.

In response to applicant's second objection, opposer states that it "does not oppose [applicant's] objection to the cited sentence on page 47 of [opposer's main] brief."[5] Reply brief, p. 23 (footnote 15).  Accordingly, applicant's objection is sustained, and the document (Exhibit 7 to Brooks deposition) is stricken and any reliance thereon is disregarded.

## The Parties

Applicant is a major manufacturer of, *inter alia*, cellular telephones and two-way radios.  Several models of applicant's cellular telephones are equipped with a proprietary technology called "iDEN" that gives the phones a "two-way radio capability integrated along with a cellular telephone capability and data capability all in one device." (Brooks testimony, p. 7).  Thus, in addition to communicating as a normal cellular telephone, applicant's iDEN-equipped cellular telephone handsets have a two-way radio feature, which is also sometimes referred to as a

---

[5] The referenced sentence in opposer's brief (on page 47) reads, "In fact, the 1800 Hz frequency is used by Motorola in other devices to indicate other functions."

"push-to-talk" or "walkie-talkie" capability. All of applicant's iDEN-equipped cellular telephone handsets emit the 1800 hertz chirp when the two-way radio feature is being used, as an indication to the user to "go ahead [proceed] or [that] the call has been completed in the two-way radio or walkie-talkie mode." Brooks testimony 9:1-3. Applicant's annual sales of these iDEN cellular telephone handsets in United States (both in volume and in units sold) over the last ten years have been very substantial. Applicant only has two customers in the United States for its iDEN cellular telephone handsets, opposer and SouthernLINC; however, the latter company served a limited geographic area and only purchased an extremely small percentage of applicant's iDEN cellular telephone handsets (in terms of sales figures).

Opposer is one of the largest providers of cellular telephone services in the United States. As a wireless service provider, sometimes called a "carrier," opposer seeks subscribers to its monthly service plans. Schweitzer testimony, 10:16-19. One of its services, which opposer calls "Direct Connect," allows subscribers to connect directly with each other using applicant's iDEN-equipped cellular telephone handsets. *Id.*, 14:3-5, 13-16. In addition to providing cellular telephone services, opposer is a retailer of cellular telephones, including those manufactured by applicant and sold with applicant's

trademarks affixed to the goods.  Opposer has filed an

application (Serial No. 78575442) to register the chirp,

i.e., the same sound that applicant seeks to register, for

various telecommunication services recited therein.[6]

Opposer's application has been suspended by the Patent and

Trademark Office based on a potential likelihood of

confusion refusal should the involved application of this

proceeding mature into a registration.  In 2005, opposer

merged with Sprint Corporation and now operates as "Sprint

---

[6] Application Serial No. 78575442 was filed on February 25, 2005
by Nextel Communications, Inc. for a sound mark described as
follows: "The sound mark consists of a tone at 1800 Hz played at
a cadence of 24 milliseconds (ms) ON, 24 ms OFF, 24 ms ON, 24 ms
OFF, 48 ms ON"; and asserting May 16, 1997 as the date of first
use anywhere and in commerce in connection with the following
services:
> "Telecommunication services, namely, electronic, electric
> and digital transmission of voice, data, pictures, music,
> video, and other electronic information via wireless
> networks; Two-way radio services; Electronic transmission of
> voice, text, images, data, music and information by means of
> two-way radios, mobile radios, cellular telephones, digital
> cellular telephones, mobile telephones, handheld units,
> namely, personal computers and digital assistants (PDAs),
> dispatch radios, and pagers; Paging services; Transmission
> of positioning, tracking, monitoring and security data via
> wireless communications devices; Mobile telephone
> communication services; Wireless Internet access services;
> Wireless data services for mobile devices via a wireless
> network for the purpose of sending and receiving electronic
> mail, facsimiles, data, images, music, information, text,
> numeric messaging and text messaging and for accessing a
> global communications network; Telecommunication services,
> namely, providing user access to telephone and Internet
> wired or wireless networks for the transmission of voice,
> data, images, music or video via a combination of persistent
> interconnection and instant interconnection/instant
> interrupt technologies; Wireless communications services,"
> in International Class 38.

Nextel," but continues to render cellular telephone, push-to-talk, and other services under the "Nextel" brand alone.[7]

Opposer has continuously run radio and television commercials, as well as print advertisements touting its services. Several television commercials in which the chirp sound was played prominently were aired nationally as early as 1998. Opposer's print advertisements made references to the chirp sound, e.g., "pretty chirping fast."[8] Although the exact numbers have been designated as confidential, we note that opposer has expended significant sums for such advertising and that, for the years 1998 at least through 2005, a great majority of the television advertisements featured the chirp.

Together, the parties have been in a long-standing business relationship, whereby applicant manufactures phones and phone accessories that function on MOTOROLA network infrastructure operated by Opposer, and which phones and accessories are sold to Opposer for resale to Opposer's cellular service customers. One aspect of the relationship between the parties was an agreement (referred to as a "co-op promotional plan" or "co-op advertising agreement") whereby applicant would partially reimburse opposer (in the form of credits against product purchases) for opposer's

---

[7] Sprint Nextel is also the parent of a wholly-owned subsidiary, Boost Mobile, which provides cellular telephone services.
[8] Exhibit 1, Matthews rebuttal testimony.

9

advertising expenditures that met certain requirements.  See Geiger Testimony, Exhibit 4 (copy of "co-op promotional plan policy" document).  In order to qualify for a partial reimbursement, opposer's advertisements would have to meet certain requirements that included use of applicant's MOTOROLA and stylized "M" (or "batwing") logo trademarks.  However, use of the chirp in advertisements was not mandatory in order to receive a reimbursement credit; indeed, the chirp is not mentioned in the co-op program guidelines.  Applicant had a similar program in place with at least one other distributor of applicant's iDEN cellular telephone handsets.

### The 911 Hz Decision & Issue Preclusion

On February 27, 2008, the Board issued a non-precedential decision in an opposition proceeding involving the same two parties to this proceeding and nearly the same proposed mark (same cadence, but with a tone at 911 Hz) for "two-way radios."[9]  In the decision (hereinafter, the "911 Hz decision"), the Board sustained opposer's (Nextel's) opposition and refused registration to applicant's (Motorola's) proposed mark on the ground that, based on that record, the 911 Hz chirp failed to function as a trademark for two-way radios.

---

[9] Opposition No. 91161817 involved application Serial No. 78235618.

10

Neither issue nor claim preclusion was pleaded by opposer as a ground in this proceeding, nor is there a pending motion to amend the pleadings in light of the Board's relatively recent decision in the 911 Hz case. However, in its brief, opposer argues that "[t]his case presents several issues identical to those fully litigated and adjudged in the 911 Hz decision." Brief, p. 5. Opposer states that applicant, in both proceedings, "asserts trademark use based on its sale of devices in which it had embedded an electronic chip capable of emitting a chirp sound, and based on various circumstances in which the sound is heard in its primary significance 'as an operational alert signal denoting the availability of a communication channel.'" Id., citing to p. 8 of the Board's 911 Hz decision. And, in its reply brief, opposer clarifies that it believes that this proceeding is "subject to issue preclusion and equitable estoppel." Reply brief, p. 7.

Applicant, on the other hand, argues that the 911 Hz decision has no preclusive effect on this proceeding. Brief, pp. 20-21. Applicant contends that the 911 Hz proceeding involved "a sound mark emitted by applicant's two-way radio products," whereas the current proceeding involves "a sound mark used in connection with applicant's iDEN cellular telephone handsets." Id., p. 20. Because of the "differing nature of the products, the trade channels,

11

business marketing models, and the end users," applicant asserts the records of the two proceedings are significantly different. *Id.*

As noted, preclusion (claim or issue) has not been pleaded as a ground for opposition. Nonetheless, because applicant has not objected to opposer's assertion of this ground, and as a result of the parties' arguments in their briefs (identified above), we deem the pleadings to be amended under FRCP 15(b) to include issue preclusion as a ground (asserted by opposer and denied by applicant).[10]

Under the doctrine of issue preclusion, if an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in a subsequent suit involving the same issue and the same parties, or at least the party against whom the same issue was adversely determined. The requirements which must be met for issue preclusion are:

> (1) identity of issues in a prior proceeding;
> (2) the issues were actually litigated;
> (3) the determination of the issues was necessary to the resulting judgment; and
> (4) the party defending against preclusion had a full and fair opportunity to litigate the issues.

*See Mayer/Berkshire Corp. v. Berkshire Fashions Inc.*, 424 F.3d 1229, 76 USPQ2d 1310 (Fed. Cir. 2005); *Jet Inc. v.*

---

[10] Because opposer specifically stated in its reply brief that it is only asserting issue preclusion (Reply Brief, p. 7, fn. 1), we do not construe the pleadings to be amended to include a claim preclusion ground.

*Sewage Aeration Systems,* 223 F.3d 1360, 55 USPQ2d 1854 (Fed. Cir. 2000); and *Larami Corp. v. Talk To Me Programs Inc.*, 36 USPQ2d 1840, 1843-1844 (TTAB 1995).

We find that all four issue preclusion requirements have been met, but with respect to only some of the goods identified in the subject opposed application, i.e., two-way radios. Specifically, in the 911 Hz proceeding, the issue of whether applicant's 911 Hz chirp failed to function as a mark on applicant's two-way radios was fully litigated between the same parties, the determination with respect to this issue was necessary to the resulting judgment, and applicant had a full and fair opportunity to litigate the issues against opposer. Here, the application subject to this proceeding covers cellular telephones <u>and</u> two-way radios, the latter goods being the same as those in the 911 Hz proceeding.[11] Thus, the Board's 911 Hz decision finding that applicant's 911 Hz chirp failed to function as a mark on applicant's two-way radios does have a preclusive effect inasmuch as the application before us now includes two-way radios.[12] Accordingly, we find that the principles of issue

---

[11] The fact that the subject application of this proceeding covers two-way radios appears to have been overlooked by the parties. Although the involved application's identification of goods is every so often acknowledged as including "two-way radios," the parties focused their arguments exclusively on cellular telephones, albeit with a two-way radio feature.

[12] The difference in pitch between the prior and current marks, i.e., 911 Hz versus 1800 Hz being played in the same on/off cadence, is minimal and does not prevent application of issue preclusion. *See, Aromatique, Inc. v. Arthur H. Lang*, 25 USPQ2d

preclusion apply in this case and that opposer is entitled
to judgment on the ground that applicant's proposed 1800 Hz
chirp fails to function as a trademark with respect to the
two-way radios.[13]

To be clear, we find that issue preclusion is not
applicable to applicant's proposed mark in connection with
cellular telephones.

## Standing

Opposer must prove its standing as a threshold
matter in order to be heard on its substantive claims. *See,
for example, Lipton Industries, Inc. v. Ralston Purina Co.*,

---

1359 (TTAB 1992) (claim preclusion applicable with regard to
prior opposition because marks essentially identical where
subject mark differs "ever so slightly in typeface and
capitalization" from mark in prior application). Furthermore,
applicant's argument that the records of the two proceedings are
different because of "the differing nature of the products, the
trade channels, business marketing models, and the end users" is
premised solely on a comparison of cellular telephones and two-
way radios. In order words, applicant does not argue that the
records of the two proceedings are in any way different regarding
the goods in common, i.e., two-way radios.

[13] Normally, when an opposition is sustained with respect to
certain goods or services for which registration is sought, it is
generally proper to sustain the opposition with respect to the
entire class of goods or services. *Cf. In re Analog Devices
Inc.*, 6 USPQ2d 1808 (TTAB 1988), aff'd without pub. op., 871 F.2d
1097, 10 USPQ2d 1879 (Fed. Cir. 1989). *See also, Krause v.
Krause Publications Inc.*, 76 USPQ2d 1904 (TTAB 2005). However,
issue preclusion applies only to issues actually decided, in this
case whether the chirp functions as a mark for two-way radios,
and the issue as it relates to cellular telephones (albeit with a
two-way radio feature) was not decided in the 911 Hz proceeding.
Moreover, because issue preclusion was not brought up until the
briefing, and the parties clearly view the telephones as
presenting a separate and distinct issue, we will not allow the
late assertion of issue preclusion to cause the whole class to
fail. Therefore, judgment on the basis of issue preclusion will
not be entered as to the entire class.

670 F.2d 1024, 213 USPQ 185 (CCPA 1982). To do so, the Federal Circuit has set forth a liberal threshold for determining standing, namely, whether a plaintiff's belief in damage has a reasonable basis in fact and reflects a real interest in the case. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999). *See also Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628 (Fed. Cir. 1988).

In this case, opposer has established that it is the owner of application Serial No. 78575442 for the same 1800 Hz chirp sound mark covering services that are closely related to applicant's identified goods, and being offered to the same customers in the same trade channels. As already noted, opposer's application has been suspended pending a potential refusal under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), based on a likelihood of confusion with applicant's mark. As a result, opposer has established a reasonable basis for its belief in damage resulting from applicant's registration of its chirp, and a real interest in this case. *See Ritchie v. Simpson, supra*. *See also* TBMP §309.03(b) (2d ed. rev. 2004) and the authorities cited therein. Therefore, opposer has standing to bring this opposition proceeding.

### Sound Marks and Inherent Distinctiveness

Applicant notes correctly that the Patent and Trademark

15

Office published the subject application for opposition without requiring a showing that the chirp had acquired distinctiveness for the identified goods, thus indicating that the Office believed the chirp is inherently distinctive.  Applicant further correctly points out in its brief that the Board has long and often acknowledged that the Trademark Act provides "a flexible approach toward the concept of what constitutes a service mark or a trademark" and that "sounds may, under certain conditions...function as source indicators in those situations where they assume a definitive shape or arrangement and are used in such a manner so as to create in the hearer's mind an association of the sound with a [good or] service."  *In re General Electric Broadcasting Co., Inc.*, 199 USPQ 560, 563 (TTAB 1978).  See also, *In re N.V. Organon*, 79 USPQ2d 1639, 1644 (TTAB 2006) (the Trademark Act includes a broad definition of "trademark," and it is the source-distinguishing capacity of a proposed mark that is significant, "not its ontological status as color, shape, fragrance, word or sign") quoting *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995).  In support of its position that the chirp is inherently distinctive, applicant places great emphasis on the *General Electric* decision.

First, the Board is not bound by the decisions of examining attorneys to approve proposed marks for

publication. *In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001); and *In re Sunmarks Inc.*, 32 USPQ2d 1470 (TTAB 1994). Further, notwithstanding the Board's flexibility toward what constitutes a trademark, the Board very recently determined that certain sound marks are not inherently distinctive. *In re Vertex Group LLC*, 89 USPQ2d 1694 (TTAB 2009). We find that the chirp, because of the nature of its use, i.e., in connection with cellular telephones, cannot be inherently distinctive.

The applicant in *Vertex* sought registration of a pulsating sound mark in connection with personal security alarms and children's personal security alarm bracelets, but was refused registration by the Patent and Trademark Office on the ground, *inter alia*, that the mark was not inherently distinctive. In affirming the refusal on that ground, the Board stated that sound marks for certain types of goods can never be considered inherently distinctive.

> When a sound is proposed for registration as a mark on the Principal Register, for goods that make the sound in their normal course of operation, registration is available only on a showing of acquired distinctiveness under Section 2(f). Examples of such goods would include products such as alarm clocks, appliances that include audible alarms or signals, telephones, and the alarm products of applicant.

> *Id.* at 1700.

The record in this proceeding clearly establishes that cellular telephones, including those manufactured by applicant that emit the chirp, fall into the category of

17

goods that make sound in their normal course of operation. Indeed, applicant's cellular telephones emit several other tones, "whether it be low battery alerts, *et cetera*, that could be emitted for a particular function." Brooks testimony, 66:4-12. Aside from the chirp, applicant's own Rule 30(b)(6) witness, Mr. Werner, acknowledged that there are "many different tones for -- alerts of various types" and that [t]here are call alert tones, all used for signaling the user that something is – that they should be aware that something is going on." Werner testimony, 39:12-13, 15-18. In view thereof, there is no doubt that applicant's chirp, used in connection with cellular telephones, falls into the category of sounds that cannot be inherently distinctive and may only be registered upon a showing of acquired distinctiveness.

## Acquired Distinctiveness

Because the chirp lacks inherent distinctiveness for applicant's cellular telephones, the chirp may be registered only upon a showing of acquired distinctiveness. Applicant has pleaded in the alternative that if the Board finds the chirp to not be inherently distinctive, as we have, then the chirp has acquired distinctiveness. In support of this claim, applicant argues that it has been manufacturing cellular telephones that emit the chirp since 1996; that sales (in dollar values and units sold) of these cellular

18

telephone handsets have been significant; and that applicant has expended "significant resources" in "advertising and promotional efforts" of the chirp in connection with the handsets. In addition, applicant relies on two consumer surveys, commissioned and introduced by opposer via the testimony of opposer's expert witness, Mr. Jacoby, to determine whether the chirp has acquired distinctiveness.

Opposer argues that the chirp has not acquired distinctiveness as a trademark for applicant's cellular telephones. Opposer also points to the consumer surveys it commissioned and asserts that "in contrast with over half of the respondents who named Nextel, Sprint or Boost, only 1.5 percent of the combined 310 respondents mentioned Motorola as the single company with which they associated the [chirp]." Brief, p. 48. Opposer goes on to note that applicant did not present any independent direct evidence to suggest that the chirp has acquired distinctiveness, and argues that applicant's sales and promotional efforts with respect to the cellular telephones "do not focus at all on any trademark significance of the [chirp]." Brief, p. 49.

"Distinctiveness is acquired by 'substantially exclusive and continuous use' of the mark in commerce." *In re Owens-Corning Fiberglas Corporation*, 774 F.2d 1116, 227 USPQ 417, 424 n. 11 (Fed. Cir. 1985), *citing*, *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 942 (Fed.

Cir. 1984). Applicant must show that the primary significance of the proposed mark in the minds of consumers is not the product but the source of that product in order to establish acquired distinctiveness. See *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005); *In re Ennco Display Systems Inc.*, 56 USPQ2d 1279 (TTAB 2000).

As applicant correctly points out in its brief, acquired distinctiveness may be shown by direct and/or circumstantial evidence. Direct evidence includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence is evidence from which consumer association might be inferred, such as years of use, extensive amounts of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers. There is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness; however, the evidence required is in proportion to the degree of non-distinctiveness of the mark at issue. *Yamaha Int. Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988). Thus, even long periods of substantially exclusive use may not be sufficient to demonstrate acquired distinctiveness. Moreover, the burden is particularly heavy when that use has not been exclusive. *In re Gibson Guitar Corp.*, 61 USPQ2d 1948, 1952 (TTAB 2001) (66 years of use not

sufficient given similarity of configuration to other guitars).  See also *Flowers Industries Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1588-89 (TTAB 1987) ("long and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive").

We now turn our attention to the record pertaining to the issue of acquired distinctiveness.  In doing so, we are mindful of the aforementioned principles regarding an acquired distinctiveness analysis and, in particular, our determination herein is heavily influenced by the following facts.  First, cellular telephones are the type of goods from which consumers would expect to hear various types of sounds emitted as they indicate various operational functions.  Moreover, it is advantageous that the handset's operational tones be different from each other so that the user will not be confused regarding what function of the handset is being activated.  Applicant has not demonstrated that the chirp is significantly different from other operational alert tones either emitted by applicant's own iDEN handsets or competitors' goods that it would be more readily perceived and recognized by consumers than other sounds made by the handsets.  Second, another factor that strongly influences our determination as to whether applicant's chirp has acquired distinctiveness concerns the extent that others use the chirp.  Opposer, itself, uses the

chirp in advertisements promoting opposer's own services.

The two aforementioned factors are discussed in more detail below in connection with the relevant evidence of use of the chirp and, again, figure prominently in our ultimate decision as to whether applicant's chirp has acquired distinctiveness.

The Jacoby Surveys

Opposer submitted the testimony of its expert witness, Jacob Jacoby, who conducted two "mall-intercept" surveys in late 2006 concerning whether the chirp had acquired secondary meaning "among a universe of consumers who have cell phones with push-to-talk/ walkie-talkie features." [14] Jacoby testimony, 6:24-7:3. The two surveys are the subject of a report entitled, "Has the Nextel 'chirp' Acquired Secondary Meaning?", prepared by Dr. Jacoby and attached as Exhibit 1 to his deposition transcript. [15] Essentially the actual interview consisted of the interviewer playing the

---

[14] In its brief, applicant argues that the Board "should accept Jacoby's conclusions regarding the single-source aspect of the mark, but [the Board] should disregard his follow-up question regarding ownership." Brief, p. 38. Applicant's argument goes to the weight of the evidence rather than its admissibility; accordingly, we consider the survey for whatever probative value it may have, and applicant's objection to the survey question will be discussed later in this opinion.

[15] The first survey was limited to individuals with cellular telephones with the "push to talk" feature, whereas the second survey included people who were potential purchasers of such handsets. The surveys themselves were conducted at eight testing sites, spread out within the Northeast, South, Central and Pacific regions (two sites in each region).

chirp to the survey respondent and posing the following initial main question:

1a.  Do you associate that sound with any particular product or service, or do you not associate that sound with any particular product or service?

If the survey respondent answered affirmatively, the following question was asked:

1b.  Do you associate that sound with products or services that come from more than one company, or with products or services that come from one company?

Depending on the response to the above question, the survey respondent was then asked:

1c.  With what company do you associate that sound?

-or-

1d.  With what companies do you associate that sound? (with one probe of "Any others?")

In addition to the company(ies) identified by the survey respondents, responses such as "I do not know" were also recorded.

Although opposer is the party that commissioned the surveys, applicant relies heavily on certain results from the surveys, namely, that 60 percent of the first survey respondents (and 72 percent in the second survey) associated the chirp with a single source of either goods or services. Applicant concludes that these results "support Applicant's acquired distinctiveness claim."  Brief, p. 37.  Applicant contests the Jacoby report's conclusion wherein it identifies opposer as the source associated with the chirp;

specifically, "the [chirp] has acquired secondary meaning (that is, has become associated with Nextel and or affiliated companies) in the minds of those who have, or are considering buying, a cell phone that has the walkie-talkie feature." Jacoby testimony, Exhibit 1. Rather, applicant requests the Board to focus on the finding that a clear majority of the survey respondents associated the chirp with a single source – "[s]o long as respondents identify a single source, correctly or otherwise, the mark is source-identifying." Brief, p. 38.

We disagree with applicant's position that the surveys are evidence that the chirp has acquired distinctiveness for applicant's cellular telephones. The results or conclusion of the Jacoby study on which applicant relies are based on the responses from the first two questions posed to respondents in each survey, that is, questions "1a." and "1b." identified above. The problem with relying solely on the responses (and any conclusions drawn therefrom) to these questions is that it remains unclear whether the survey respondent is associating the chirp with goods, such as applicant's cellular telephones, or services, such as opposer's carrier or retail cellular telephone sales services.

The survey respondents are never asked what goods or services they associate with the chirp; however, those who

24

associated the chirp with one company were next asked Question 1c. ("With what company do you associate that sound?"). The survey respondents who answered these questions and identified "Nextel" (or one of its affiliated companies) represent 53 percent of all survey respondents, compared to 1.5 percent who identified "Motorola." Jacoby testimony, 30:5-8; and Exhibit 3. While one may make the presumption that the chirp is therefore being associated with opposer's services, rather than applicant's goods, this would only be a presumption. Again, the survey did not include a question in this regard, such as, "With what goods and/or services are you associating this sound?"

Applicant also objected to survey Question 1c. ("With what company do you associate that sound?") as "misplaced" and argues that Dr. Jacoby "veers off-track" by having such question posed; applicant requests that the Board "disregard [the question] along with conclusions [Dr. Jacoby] draws from it." Brief, p. 37. In particular, applicant argues that any reliance on the conclusions derived from responses to said question would violate the "anonymous source" rule.

The anonymous source rule essentially states that a consumer need not know the identity of the manufacturer of goods or the provider of services, and that all that is necessary to establish secondary meaning is that the consumer associates the proposed mark with a single source.

*Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 31 USPQ2d 1321, 1329 (Fed. Cir. 1994). As Professor McCarthy explained,

> All that is necessary to establish a secondary meaning is that the ordinary buyer associates the mark with a single, albeit anonymous, source. The buyer need not know the corporate or personal name of the source. When the buyer sees any related product with that mark, he is entitled to assume that it comes from the same anonymous source as every other related product so marked.
>
> 2 McCarthy on Trademarks and Unfair Competition § 15:8 (4th ed.)

The definition of a trademark essentially codifies this principle. 15 U.S.C. § 1127 defines a "trademark" as being used "to identify and distinguish the goods [and services] of one person...from those of others...and to indicate the source of the goods [and services], *even if the source is unknown*." (Emphasis added).

We find applicant's reliance on the anonymous source rule, with regard to the survey results, to be misplaced. As the Federal Circuit in *Tone Bros.* noted, "[t]he anonymous source rule is directed to the situation where a typical buyer would not know the corporate identity of the source." *Tone Bros.*, 28 F.3d at 1203, 31 USPQ2d at 1329 (citations omitted). That is not the situation here; that is, we cannot conclude that the source being associated with the chirp is "anonymous." Rather, over half of the survey respondents were able to identify opposer (or its

26

affiliates) as the source being associated with the chirp. At the very least, this indicates that there is significant consumer recognition of the chirp as being associated with a single, identifiable source of goods or services. *Cf., In re Owens-Corning Fiberglas Corp.*, 227 USPQ at 424 (survey showing 41% and 50% recognition, submitted together, found sufficient to establish acquired distinctiveness of trade dress) and *In re Jockey Int., Inc.*, 192 USPQ 579, 581 (TTAB 1976) (survey showing 51.6% recognition found sufficient to establish acquired distinctiveness for trade dress). And, while we make no finding herein that the chirp has acquired distinctiveness in connection with opposer's services (that issue is not before us), we do not discount that numerous survey respondents identified opposer as the source associated with the chirp. There is no evidence to suggest that the survey respondents were somehow incorrect, confused, or that they were mistakenly identifying opposer as the source for applicant's cellular telephones.

In sum, the Jacoby testimony and surveys do not support applicant's claim that the chirp has acquired distinctiveness for applicant's cellular telephones.

"Use" of the Chirp and Promotional Efforts

Applicant also argues that there is circumstantial evidence establishing that the chirp has acquired distinctiveness in connection with its cellular telephone

handsets. In particular, applicant argues that the chirp has been "consistently used since 1996"; that "sales under the mark have been significant"; and that there have been "significant advertising and promotional efforts involving products sold under the mark." Brief, p. 38-39. We do not agree that there is sufficient circumstantial evidence to establish that the chirp has acquired distinctiveness for applicant's cellular telephones. As discussed in more detail below, we find that applicant has not used the chirp in commerce as a mark on its cellular telephones and that promotional efforts involving the chirp, whether commissioned by applicant or others, do not prove that the chirp has acquired distinctiveness for applicant's cellular telephones.

1. Chirp "affixed" to Goods

Applicant argues that the chirp is physically "affixed" to applicant's cellular telephones which are sold in commerce. Brief, p. 22. As previously noted, and undisputed by the parties, is the fact that the chirp is emitted by an electronic chip installed in applicant's iDEN cellular telephones. Applicant likens this placement of the chip to the more traditional manner of affixing marks or logos directly onto the goods themselves. Applicant argues that the chirp "is an 'audio mark to let people know that this is [applicant's goods], much like the way we put a

logo...on the back of the handset.'" *Id.*, p. 9 (citing to Aloumanis Testimony).

The problem with applicant's reliance on this type of "use" is that, as we have already determined, the chirp is not inherently distinctive. More specifically, it is undisputed and supported by the evidence that the chirp serves as an operational alert tone to inform users of applicant's cellular telephones that a channel is available for two-way communication and that cellular telephones, including those manufactured by applicant, emit various other tones to notify users of various other operational features during their operation. In other words, the chirp is merely one of many tones emitted by various cellular telephones to denote or alert the user of the operation of a particular feature thereof.

Thus, the chirp is not so different from other operational tones emitted by applicant's cellular telephones, or competitors' cellular telephones, such that consumers would perceive the chirp as a source identifier or trademark that has been "affixed" to the goods. It is normal for cellular telephones to emit these operational tones and consumers are accustomed to hearing such tones that notify them of certain operations, e.g., an incoming call, a message (text or voice) has been received or a call missed. Ultimately, the chirp emitted by applicant's

cellular telephones in the normal course of their operation will be perceived merely as a signal to the user that one of the handset's features has been activated.

The fact that applicant may be the first and only user of the chirp (played at a specific pitch and on/off cadence) does not qualify such a tone as a mark.  Citing to *In re Illinois Bronze Powder & Paint Co.*, 188 USPQ 459, 462 (TTAB 1975), the Board noted in the 911 Hz decision that "[e]ven assuming the applicant's mark is an artistically creative, unique symbol, it is well settled that not all unique symbols qualify for the Lanham Act's protection." Accordingly, while applicant's applied-for chirp may be unique in the sense that only applicant's cellular telephones emit the chirp, the record demonstrates that the chirp is not unique in the sense that it has an "original, distinctive, and peculiar" character which conveys trademark significance. *See, e.g., In re E S Robbins Corp.*, 30 USPQ2d 1540, 1542 (TTAB 1992).

2.  "Limited Edition Models"

Applicant paid licensing fees to a variety of designers and produced iDEN-enabled cellular telephone handsets bearing the trademarks of others, e.g., PHAT FARM, BABY FAT, BLOOMINGDALES, and PININFARINA.  Applicant asserts that it "affixed" the chirp to these limited edition handsets which were intended to "reach targeted demographics."  Brief, p.

30

15. Applicant does not explain and the record does not show, however, whether the proposed chirp mark was affixed to the limited edition handsets any differently from the other iDEN handsets bearing applicant's trademarks. There appears to be no reason why the chirp would be perceived any differently on the limited edition models from applicant's non-limited edition iDEN cellular telephones. Thus, we fail to see how this evidence advances applicant's argument that the chirp is being used as a trademark on its goods or how this advances applicant's argument that the chirp has acquired distinctiveness as a trademark.

3. Trade Shows

Applicant has presented evidence that it promoted its iDEN-enabled cellular telephones at numerous trade shows between 2000 and 2007. Applicant's budget for these shows has been substantial. Applicant's vice president for Sprint and iDEN international products, Mr. Aloumanis, described that, at these trade shows, applicant would "show how the product is – how the product can be used, what some advantages are, features and functions, that sort of thing." Aloumanis Testimony at 10:21-23. He said that the chirp was heard during product demonstrations at these trade shows and labeled the chirp as a "key differentiator for our product relative to all the other handsets" because the cellular telephones had the ability to allow users to "do business

31

instantaneously through the use of the iDEN technology."
Id. at 14:1-5.  The chirp would be heard during these
demonstrations and, according to Mr. Aloumanis, it was
"integral to that experience."  Id. at 14:16.

Despite the extensive trade show promotion of
applicant's iDEN-enabled cellular telephones, we cannot make
a finding that this translates into the chirp being used in
commerce as a source-identifier for the goods.  Even though
the trade shows incorporated hands-on demonstrations touting
the two-way radio feature, or the "key differentiator", of
the products, this emphasis appears only to distinguish or
differentiate a certain feature of applicant's goods from
competitors' goods.  There is no indication that the chirp
was serving a trademark function or being promoted as a
trademark during these demonstrations or as anything other
than an indication that a channel is available.  During the
demonstrations, consumers expected to hear this chirp or
some other operational tone when that feature was activated
in order to notify them to continue with their two-way
communication.

4.  Product Placement Advertisements

The record shows that applicant employed a full-time
representative, Mr. Matthew Gordon, as an entertainment
marketing liaison between 2001 and 2007.  Mr. Gordon was
directed by Mr. Aloumanis to have applicant's cellular

telephones placed as props and the chirp audibly played in television programs and movies. The evidence bears out that Mr. Gordon was successful in this regard; applicant's cellular telephones appeared in numerous television programs and movies and the chirp was audibly played during the operation of the cellular telephones in the scenes in which they appeared. In most, if not all of the product placements, applicant did not pay for such placement but provided the production set with applicant's iDEN cellular telephone handsets. In addition to television programs and movies, Mr. Gordon was also successful in placing applicant's cellular telephone iDEN handsets in at least two video games. In the latter case, as to video games, a more formal agreement was drafted and applicant actually paid a significant amount of money to have its iDen cellular telephones (and the chirp) placed in the games. Applicant points to the product placement evidence and argues that it establishes that "consumers have been educated to perceive the [chirp] as a trademark through applicant's product placements in television, movies, and video games, where applicant relied on the sound mark and the distinctive shape of the iDEN handset to identify and distinguish its products." Brief, p. 22, citing to Aloumanis Testimony.

Upon reviewing all of the product placement evidence, we are not convinced that viewers (or game users) would

perceive the chirp as anything more than just a byproduct or operational tone emitted by the actual cellular telephone handsets. The fact that the chirp is audible and the cellular telephones are used as props in the various television shows, motion pictures and video games is not evidence that viewers are actually being exposed to the chirp as a trademark. While the chirp will draw the viewer's attention to the telephones, it remains unclear whether the viewer will perceive the chirp as a source identifier. And, in at least one placement, a different operational tone, i.e., not the chirp, is heard and it appears to be alerting the user in the program (or movie) that someone is seeking to contact them by telephone. See, *e.g.*, Gordon Exhibit 22. Thus, even if viewers understand that these telephones are unique or different in their capability to carry on two-way radio style conversations, there is no reason to believe that the chirp itself is being used to identify the source of the telephones. Rather, consumers will hear the chirp (and other tones) and correctly attribute them as being one or more of several operational tones that cellular telephones routinely emit when in use.

For purposes of determining whether or not the chirp functions as a trademark in the product placements, it does not matter whether or not the consumers (viewers) would

recognize the source of the actual cellular telephone handsets based on the product configuration or trademark affixed to the handsets.  And, to the extent that applicant argues that viewers will recognize the cellular telephones because applicant's logo (a stylized letter "M") is affixed to the goods, this does not mean that viewers of the product placements are ascribing any source-identifying significance to the chirp.  Applicant cites to no authority for its contention that the presence of other marks on its goods will elevate a feature-specific sound such as its chirp to a recognizable trademark, especially when applicant's own sales demonstrations emphasize the primary significance of the chirp as a signal that a communications channel is available for use.

5.  Applicant's Radio and Television Advertisements

In its brief, applicant states that it "engages in radio and television promotion using its 1800 Hz Mark." Brief, p. 16.  Applicant's witness, Mr. Aloumanis, testified that applicant initially did a product placement of its iDEN handsets on the radio show of Howard Stern.  It then "took bits and pieces of that [product placement] and turned it into a radio spot on his show."  Aloumanis Testimony, 23:15-22.  Mr. Aloumanis further testified that applicant produced and ran a television advertisement involving rats in a doughnut shop communicating with each other via applicant's

iDEN handsets.  *Id.* at 23:23-24:12.  In both the radio and television advertisements, which Mr. Aloumanis testified were run nationally, the chirp was audible and was "a critical feature and function and mark of the products, so especially on the radio where you can't actually, you know, see the product,...so the chirp is critical to both Motorola and to denote this unique capability which the iDEN technology has."  *Id.* at 24:19-25:2.

Based on Mr. Aloumanis' testimony, it is not possible to ascertain whether the chirp is being promoted or perceived as a trademark.  The radio and television advertisements were not submitted as exhibits to the testimony of Mr. Aloumanis.  Thus, we cannot possibly assess the effect the chirp had on the listeners and viewers or what association could be made between the chirp and applicant's cellular telephones.  Without such critical evidence, we simply cannot rely on Mr. Aloumanis' description of the advertisements to conclude that the chirp would be regarded as a source-identifier in either of the advertisements.

6.  Opposer's Advertisements (and the Co-Op Advertising Program)

Applicant argues that the chirp has been used "in a trademark manner in its distributors' advertisements, including several advertisements expressly covered by Applicant's iDEN co-op advertising program."  Brief, p. 28.

The record includes several radio and television advertisements produced by opposer regarding cellular telephones and/or cellular telephone services associated therewith.  (Geiger Testimony, Exhibits 11-13; Matthews Testimony, Exhibits 3, 5, 7-8; Schweitzer Testimony, Exhibit 3).  Applicant contends that these advertisements constitute evidence of the chirp being used in commerce in such a way that it would be regarded as a trademark for applicant's cellular telephones.

Before we discuss these advertisements, we note that the parties dispute certain dynamics of the co-op advertising program; in particular, the parties disagree as to the program's purpose and whether certain advertisements run by opposer were covered by the program.  These issues, however, are not relevant in our analysis of the advertisements or for purposes of this decision.  The "mere intent that a term function as a trademark is not enough in and of itself, any more than attachment of the trademark symbol would be, to make a term a trademark."  *In re Manco Inc.*, 24 USPQ2d 1938 (TTAB 1992) (THINK GREEN failed to function as a mark for, inter alia, mailing and shipping cardboard boxes).  *See also In re Volvo, supra* (DRIVE SAFELY failed to function as a mark for automobiles and structural parts therefor); *In re Remington Products, Inc.*, 3 USPQ2d 1714 (TTAB 1987) (PROUDLY MADE IN THE USA failed to function

37

as a mark for electric shavers and parts thereof); and *In re Morganroth*, 208 USPQ 284 (TTAB 1980) (NATUR-ALL-IZE YOUR HAIR COLORING failed to function as a mark for hair styling salon services).  Thus, even assuming *arguendo* that it was explicitly clear that one objective of the co-op agreement was to promote the chirp as a trademark of applicant, this is not conclusive evidence that applicant (or opposer, on applicant's behalf) is actually using the chirp in commerce as a mark on its cellular telephones.  On the other hand, the Board has found, albeit rarely, that even if a company itself has not made use of a term, it may have "'a protectable property right in the term' if the public has come to associate the term with the company or its goods or services."  *Big Blue Products, Inc. v. International Business Machines Corporation*, 19 USPQ2d 1072 (TTAB), citing, as an example, *American Stock Exchange, Inc. v. American Express Co.*, 207 USPQ 356, 364 (TTAB 1980).  Thus, we review opposer's advertisements based on the propositions that even if the intent of the advertisements is that the chirp be promoted or perceived as a trademark for applicant's cellular telephones, they may not necessarily achieve this goal; and, conversely, even though it may not have been opposer's intent, their advertisements may have helped applicant reach the goal.  Ultimately, in order for the chirp to have acquired distinctiveness as a trademark

for applicant's cellular telephones, the chirp must be promoted in such a manner that allows it to be perceived and recognized by consumers as a trademark for said goods.

We turn now to the content of the television and radio advertisements run by opposer. In general, these advertisements are noticeably different from applicant's advertisements and product placements already discussed, inasmuch as the chirp is played in a manner not necessarily associated with the normal operation of the cellular telephones. Rather, in many of opposer's advertisements, the chirp is either emitted gratuitously or as an apparent audible prompt used to underscore points made by the narrator regarding features of the telephone or the cellular telephone service associated therewith. Nonetheless, for several reasons, we disagree with applicant's ultimate assessment that these advertisements demonstrate that the chirp would be perceived as a source identifier for applicant's cellular telephone handsets.

First, in all of opposer's advertisements of record, the source-association made with the chirp, if any, is with "Nextel." It is the "Nextel" name that is repeatedly and prominently mentioned throughout the advertisements. It is also the "Nextel" name that is mentioned either shortly before or after the chirp is played. For example, in the radio advertisement (Geiger Testimony, Exhibit 11), the

39

chirp is heard three times, each time in proximity to the commercial narrator advertising "Nextel telephones," touting their capabilities and special offers, all from "Nextel" stores and website.  It is only at the end of the advertisement when the narrator's voice changes and, speaking rapidly, provides qualifying language describing special requirements to receive the offer, that we hear the statement "phones provided by Motorola."  Thus, even if the latter message is intelligible to the listener, it is not clear that the listener, after hearing the telephones advertised as "Nextel" phones, with specific models identified, will understand the reference to Motorola.  More importantly, the chirp is not played when the narrator states "phones by Motorola" in the commercial.  Thus, there is little chance that the chirp will be associated with applicant's cellular telephones.

In the other advertisements that applicant claims are "co-op eligible" (Geiger Testimony Exhibit 12-13, television commercials), the chirp is also played in a prominent audible manner as the features of the telephones and/or price are emphasized.  And, although the telephones displayed in the commercials contain what appears to be applicant's stylized "M" logo along with a notice (in smaller print) identifying "phones from Motorola," the

40

commercial's narration clearly (and only) refers to the telephones as "from Nextel" or "the new i710 from Nextel." Moreover, all of the contact information on how and where to get these telephones clearly and unambiguously references "Nextel" either by the narration ("go to Nextel stores") or at the end by providing a telephone number, "888-8-NEXTEL" and Nextel's website address. Consumers may believe (mistakenly) that opposer is the manufacturer of the telephones or they may believe (correctly) that opposer is providing retail services featuring the sale of such cellular telephones. However, because of the references to Nextel in these advertisements, we cannot conclude that consumers would associate the chirp with Motorola, or that they would perceive the chirp as a trademark for Motorola cellular telephones. We find that these television commercials do not demonstrate use of the chirp as a source-identifier for applicant's goods and therefore do not serve to show that the chirp has acquired distinctiveness as a mark.

Applicant's reliance on opposer's other television commercials (Matthews Testimony, Exhibits 3, 5, 7-8) is even more tenuous because, although the chirp is played, there is no mention of applicant. Rather, the association made with the chirp in these commercials appears to be with "Nextel." Nonetheless, applicant argues that these commercials are

41

relevant because they "clearly depict applicant's iDEN handsets." Brief, p. 31. The problem with this argument is that it assumes that viewers are actually able to recognize the telephones as belonging to applicant based on their shape or a fleeting image of applicant's logo. The record does not establish that the shape of applicant's cellular telephones is so distinctive that consumers could make the association with applicant.

Based on our review of all of the advertisements produced by opposer, regardless of whether they were subjects of the co-op program, we find that the impression created by the advertisements is that the advertiser is attempting to associate the chirp with "Nextel." Although applicant's cellular telephones may have been placed in the commercials, in some cases prominently, it is still the "Nextel" name and contact information that was being projected repeatedly to the recipient of these advertisements. And, because opposer renders cellular telephone carrier services as well as retail sales services of cellular telephones, to the extent that a viewer of these advertisements would consider the chirp as a trademark, it is more likely that the viewer would associate the chirp with said services, rather than applicant's cellular telephones. Again, we make no finding as to whether the chirp serves as a trademark for opposer's services as that

42

issue is not currently before us. Rather, based on the use of the "Nextel" name in the advertisements, we cannot find that consumers would associate the chirp with applicant's cellular telephones.

<u>Conclusion: The Chirp Has Not Acquired Distinctiveness for Cellular Telephones</u>

There is no question that applicant has sold many iDen-enabled cellular telephone handsets and has expended great sums of money in advertisements for these goods. The exact numbers remain confidential, but we do acknowledge that the sales figures (including revenue and units sold) have been substantial and are impressive. However, what is missing from the record is evidence corroborating applicant's characterization of these numbers, namely, that the cellular telephones were "sold under the chirp mark" or that the chirp was used in such a way that it would be recognized as a source-identifier for applicant's goods in the advertisements.

What is perhaps the most damaging to applicant's case for acquired distinctiveness is that the record establishes that opposer has been extensively using the chirp in advertisements in connection with its services for a number of years. And, "[i]n most oppositions to registrations under Section 2(f), prevailing opposers have presented some evidence that the mark has not acquired distinctiveness, such as others' use of the proposed mark or similar marks."

*Yamaha*, 6 USPQ2d at 1008-09. Here, opposer has demonstrated that it has used the chirp in connection with its services for promotional purposes nearly as long as applicant.

We acknowledge that acquired distinctiveness allows for use by others, but such use is permitted only so long as it does not rise to a level that invalidates the applicant's claim of "substantially" exclusive use. Here, opposer's contemporaneous use of the chirp in connection with services closely related to applicant's goods has been, at the very least, substantial and certainly rises to the level necessary to rebut applicant's contention of substantially exclusive use, and along with the other deficiencies noted above, defeats applicant's claim of acquired distinctiveness. *Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972); *McCormick & Co. v. Summers*, 354 F.2d 668, 148 USPQ 272 (CCPA 1966); and *DeWalt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 129 USPQ 275 (CCPA 1961).

Ultimately, applicant has not shown by a preponderance of the evidence that the chirp has acquired distinctiveness for cellular telephones.

Having found that applicant's proposed chirp mark is not inherently distinctive and, based on this record, has not acquired distinctiveness for applicant's cellular telephones, we need not make a separate determination as to

opposer's other ground for opposition, that applicant has not used the chirp as a trademark in commerce for cellular telephones.[16]

**Decision:** The opposition is sustained as to two-way radios on the ground of issue preclusion. The opposition is sustained as to cellular telephones on the grounds that the mark is not inherently distinctive and has not acquired distinctiveness. Registration to applicant is refused.

---

[16] Likewise, we do not consider opposer's argument that, "Although the Nextel Chirp has acquired distinctiveness as a mark, Motorola does not own the mark. Nextel does." Brief, p. 24. Applicant objected to this argument as comprising "an unpleaded claim" of alleged non-ownership of the mark, but argued "in the event the Board allows Opposer to proceed on this ground, it fails on the merits." Brief, pp. 44-45. We agree with applicant that this claim was not pleaded by opposer and we will not consider it at this juncture. See, e.g. *Micro Motion Inc. v. Danfoss A/S*, 49 USPQ2d 1628, 1629 (TTAB 1998) (unpleaded issues considered under Fed. R. Civ. P. 15(b)(2) only when adverse party is "fairly apprised that the evidence was being introduced in support of the unpleaded … issue."). Moreover, even had the claim been pleaded or we deemed the pleadings amended and considered the claim tried by implied consent, we would not necessarily reach this issue. That is, because we find that applicant has not established on this record that the chirp has acquired distinctiveness for applicant's cellular telephones, we need not determine any ownership issue.